# SUPERIOR COURT

Charlotte R. Hatton
vs. } Eq. No. 6639.
Howard Braiding Co.
et al

### RESCRIPT

January 21, 1925

BARROWS, J. Heard on bill, answer, including cross-bill, replication and oral testimony on issues of fact. The cross-bill of respondent prays for a transfer of certain stock from complainant to respondent and for an accounting for dividends on this and other stock.

At the conclusion of the complain-

ant's case the bill was dismissed as to three respondents against whom no relief was asked or could be granted.

The bill as originally framed charged conspiracy between respondents whereby they, with knowledge of his ownership, deprived complainant of certain stock. At the hearing and prior to the offering of any testimony, complainant disclaimed any charge of actual fraud against respondents and amended the bill to avoid the possibilty of dismissal for failure to prove actual fraud.

Grant vs. Wilcox, 44 R. I. 94.

The bill now stands as one for the reclaiming of a certificate for five shares of stock of the Standard Oil Company of New Jersey, alleged to have been mistakenly transferred to respondent without the owner's consent and for the rescission of the transfer.

At the close of the testimony respondent raised the question whether a court of equity had jurisdiction to determine the cause. On the strength of General Laws 1923, Chap. 250, Sec. 7, Uniform Stock Transfer Act, we find that a court of equity has jurisdiction and is the only court of "appropriate jurisdiction" to specifically enforce complainant's alleged right to reclaim possession of the stock certificate in question.

The facts in the case are unusual but appear to us clearly established by documentary evidence. We are fortunate in having an unusually well kept set of books over the period in question. Complainant and respondent do not, however, draw like inferences from the book entries and the oral testimony. We can not accept the inferences drawn by complainant that respondents knew the true facts and slept upon their rights or acquiesced in the conduct of complainant with knowledge of the facts.

Certain transmutations have taken place in the form of the stock certifi-

cate by reason of the splitting up under United States Court dissolution orders of the original stock of the Standard Oil Company of New Jersey. Several of these will have to be noticed in connection with the cross-bill but the principles controlling the case are not affected thereby. For the sake of simplicity in discussing the present case, therefore, we shall speak of the stock as if there had been no change in the form of the original certificate for five shares of stock of the Standard Oil Company of New Jersey.

The bill is brought by complainant individually and as executor of the estate of Charles N. Howard. Individually she has no standing. As executor her claim is that five shares of Standard Oil Company stock which stood in the name of Charles N. Howard at the time of his decease on September 27, 1910, have by mistake been transferred to respondent corporation. The prayer is that they be re-transferred to complainant to hold as part of Howard's estate. As complainant stated the case in opening, the law question involved is simply: who owns the stock?

The five shares of Standard Oil Company stock in question were issued on June 20, 1901, to Charles H. Remington and so stood on the books of the Standard Oil Company until September 17, 1906. At the latter date "the Howard Braiding Company was organized with Charles N. Howard owning a controlling interest in its stock and Charles H. Remington and his sister Charlotte R. Hatton, the complainant, owning only minor holdings. Respondent and complainant were nephew and niece of Charles N. Howard. The books of the Howard Braiding Company, which were kept with unusual care, show in the handwriting of both Charles N. Howard and Charles H. Remington that Remington sold these five shares to the corporation on September 17,

1906, for their then market value of $604 per share, a total of $3020. The certificate, however, when transferred by the Standard Oil Company on September 18, 1906, was re-issued to Charles N. Howard without other designations. Payment for these shares was made to Remington from $2400 borrowed by the Howard Braiding Company from the United National Bank, said five shares being turned over to the bank as collateral. This $2400, with $620 taken from the funds of the company, paid for the stock (Cash Book, page 19). The note given the bank was a corporate obligation and executed by Charles N. Howard as treasurer. At no time is there the slightest evidence that any other than corporation money paid for any portion of the stock. The dividends on the stock came in by check to Charles N. Howard, in whose name it stood, and by him were, as long as he lived, turned over to the corporation regularly as shown by its books. There is no evidence that Howard ever made any claim of personal ownership of this stock. On the other hand, several statements of the financial condition of the company made by Howard to secure subsequent bank credits between 1906 and 1910 show that he listed these five shares among the assets of the corporation. Continually from the time of the first pledge of the five shares until July, 1923, the stock was held by the bank as collateral for the original note and succeeding loans to the corporation. All of these are shown on the company's books and until Howard's death the corporate notes always were executed by Charles N. Howard as treasurer, the last one within a week of his death. He was the dominating factor in the corporation and owner of substantially all of the corporation stock.

As before stated, Charles N. Howard died September 27, 1910. He had been the sole manager of the

corporation. Remington had been merely an employee in the business with a nominal holding of stock. Complainant likwise had been only a nominal stockholder. By Howard's will he made complainant, and respondent his executors, and gave to each one-half of his estate. When Howard died, Remington by reason of some mental malady did not qualify as executor and the complainant alone did so. Remington continued, however, as an officer of the Howard Braiding Company till 1915, though the records show no attendance at meetings after April 20, 1912, and his active business career had practically ceased before 1910. Remington's wife, however, on Howard's death, stepped into active management of the business as treasurer and director, and she has since conducted it. Prior to her active management she knew nothing of the facts above related concerning the five shares of stock, except that her husband had sold them and got paid for them. She says that she supposed he sold them to the corporation, but she had no definite information nor did she pay any attention to it at the time. At the outset of the administration of Howard's estate, Mrs. Remington and Mrs. Hatton discovered that the stock stood in Howard's name and in conference with Mr. Henshaw, acting for the executrix, all assumed that it was Howard's own property. No one gave a thought to it as part of the corporate assets. It is important to observe that at this time neither Mrs. Remington nor Mrs. Hatton knew anything about the details of the corporate business. As the dividends came in after Howard's death, they were assumed to be the property of Howard's estate and checks were collected by complainant as his executrix. She divided the proceeds equally between herself and her brother, who received them through

his wife. Complainant, as executrix, also received various stock dividends on the breaking up of the Standard Oil Company, some of which she now has and which are demanded by respondent in the cross-bill.

Pursuant to information from Mrs. Remington, on December 31, 1916- W. C. Johnson, who had just come into the corporation, and was then president of the company, directed that these shares be charged off the books as no part of the assets of the corporation. Prior thereto they had been formally carried along from year to year. The business had been going badly during several years after Howard's death and so carrying the book entries doubtless helped corporate credit to some extent. We find nothing in the testimony to support the claim that either Mrs. Remington, Johnson, or the bookkeeper, Miss Miley, had reason to consider prior to 1923 the real facts connected with the acquisition of these shares or that they belonged to the corporation though standing in Howard's name. Such was the course of events until March 15, 1923. At that time a consolidation was under consideration by three braiding companies, of which the Howard was one, and a careful examination of the Howard Company's books was made to evaluate its assets. Among other obligations outstanding was a corporation note secured by pledge of the stock in question and a search was made through the old books to trace the travel of this stock. As above stated, the evidence showed it had been carried for a time after Howard's death as a corporate asset and that about 1916 the interested parties, all bona fide believing that it was Howard's personal stock, loaned by him to aid the credit of his corporation, struck it from the list of corporate assets. Complainant, during all the years mentioned, retained her original small holding and a much larger interest in the

corporation by reason of being the beneficiary of one-half of Howard's estate. About April 1, 1920, complainant sold her shares to W. C. Johnson and Mrs. Remington, who were then conducting the business. We do not deem it important to determine whether the $10,000 which she received for her share was or was not a good price. Clearly the business was not in a flourishing condition. Fifty-six thousand deficit, as shown by the corporation books at the end of 1919 (Journal 3, p. 267), is not a prosperous condition. Neither Johnson nor Mrs. Remington then knew that the Standard Oil Company stock belonged to the corporation. Complainant can hardly claim that respondents had constructive knowledge from corporate records that the value of Braiding Company stock was greater than disclosed to her on account of the Standard Oil Company stock being corporate property, without having the same knowledge imputed to herself. The facts clearly show that no one actually knew it. Late in 1922, or early 1923, the discoveries above made caused respondent on March 15, 1923, to notify complainant of the facts. She naturally was surprised and shocked and refused to accept the view that the shares did not belong to the estate of Charles N. Howard, whereupon the company, about September 28, 1923, paid off the loan for which the stock stood as collateral and had the certificate transferred to itself.

Complainant asserts, and cites authorities therefor, that the Howard Braiding Company did not have power to hold stock in other corporations. Such a situation makes the whole transaction perfectly natural. It explains why the five shares of Standard Oil Company stock when paid for from corporate funds were taken in the name of Howard, who was the man of a one man corporation. In the light of the entire evidence in the case we are convinced that the stock in equity always belonged to the Howard Braiding Company and that Howard was merely a trustee for the company. The acts of Charles H. Remington, the only living person who knew the facts, in receiving the dividends after 1910 are easily understandable, either because his mental condition rendered him insensible to what was taking place or, if mentally sound, because of his belief that a division was proper as he and complainant were substantially half owners of the corporate stock in equal shares inherited from Charles N. Howard.

With this evidence we are asked to now find that the five shares belong to the estate of Charles N. Howard. We can not so find. He, himself, not only did not but could not have set up any claim of personal ownership adverse to the corporation for whom he held the stock in trust without asserting a hostile claim in most unequivocal terms. Complainant as executrix is in no better position so far as her rights are derived from Howard. She claims, however, that by acquiescence, waiver, laches or estoppel since 1910 she has acquired title to these shares.

With the numerous cases cited we have no quarrel. Our difficulty is with complainant's inference that respondent after 1910 knew or was chargeable with knowledge that complainant was holding corporate property under a claim of ownership adverse to the corporation. At a very early moment after discovery of the actual facts respondent notified complainant. Never was there any voluntary waiver of rights by respondent nor acquiescence in a claim known to be adverse after the facts were known. Laches does not apply against a person ignorant of the true facts. Estoppel has no application in a case of the present nature.

Complainant also asserts that under the power of attorney the certificate should have been returned to her instead of transferred to the corporation when the loan was repaid. Legally and technically there may be grounds for this position. Complainant, however, in the course of the trial stated that she did not choose to assert wrongdoing on the part of the bank. We have before us all interested parties. If complainant had received the legal title from the bank, she would be a mere trustee without beneficial interest. From her a conveyance could be ordered. We see no reason why with the parties all before us we should not adjust the whole controversy at this time.

In answer to the question: "Who owns the shares?" we find that respondent Braiding Company always was the beneficial owner and is now the legal owner as well.

Necessarily, from the above, we must find that respondent is entitled to the relief sought in its cross-bill. Complainant holds the stock now 'in her name which she received as dividends on the breaking up of the five shares of Standard Oil Company as trustee for the respondent and should convey same to the respondent. We fail to see under our finding how we can legally refuse respondent its prayer for an accounting.

Decree may be entered accordingly.

For complainant: Henshaw & Sweeney and John W. Baker.

For respondents: Percy W. Gardner, Ada L. Sawyer, McGovern & Slattery.